UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEBORAH A. ALESIA, | ) | |
| | ) | |
| Plaintiff, | ) | 12 C 8395 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security. | ) | |
| | ) | |
| Defendant. | ) | |

**M<small>EMORANDUM</small> O<small>PINION AND</small> O<small>RDER</small>**

Deborah Alesia filed a claim for disability insurance benefits ("DIB") with the Social Security Administration. The Commissioner denied the claim, Alesia sought judicial review, and the district court remanded for further proceedings. 789 F. Supp. 2d 921 (N.D. Ill. 2011) (Denlow, M.J.). On remand, Alesia received a hearing before an administrative law judge ("ALJ") pursuant to 20 C.F.R. § 404.914. The ALJ denied the claim, Doc. 8-12 at 2-16, and Alesia declined to file exceptions to the decision with the Social Security Appeals Council, making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.984(d) ("If no exceptions are filed and the Appeals Council does not assume jurisdiction of your case, the decision of the administrative law judge becomes the final decision of the Commissioner after remand."); *Daniels v. Colvin*, 2014 WL 2158999, at *1 (N.D. Ill. May 23, 2014). Alesia timely sought judicial review pursuant to 42 U.S.C. § 405(g), Doc. 1, and the parties have cross-moved for summary judgment, Docs. 12, 20. Alesia's motion is granted and the Commissioner's motion is denied, and the case is remanded to the Commissioner for further proceedings.

## Background

The following facts are taken from the administrative record.

1

A.     **Factual Background**

The basis for Alesia's DIB claim is that she suffers from fibromyalgia and depression. Her alleged onset date is November 3, 2006. Doc. 8-12 at 7.

Alesia received treatment at the Fibromyalgia Treatment Centers of America from September 2003 through July 2006. Doc. 8-10 at 2-139; Doc. 8-11 at 2-33. In April 2005, Dr. Michael McNett suggested that Alesia should work from home at least three days per week. Doc. 8-8 at 7. In June 2005, Dr. McNett noted that work-related stress made Alesia's condition "significantly worse," that she had fourteen out of eighteen tender points, that she was "totally disabled from all job duties," and that she had "[s]evere limitation of functional capacity," rendering her "incapable of minimum (sedentary) activity." Doc. 8-9 at 8; Doc. 8-10 at 20-22, 72. In July 2005, Dr. McNett indicated that Alesia could not stand or sit for more than thirty minutes at a time, required frequent resting, could not return to work for two months, and needed to work on a part-time basis upon her return. Doc. 8-10 at 77-79. In September 2005, Dr. McNett noted that Alesia's condition had improved significantly with treatment. Doc. 8-8 at 110. In March 2006, Dr. McNett stated that Alesia's condition was permanent and that she was "unable to perform work of any kind." Doc. 8-10 at 82. In July 2006, Dr. McNett reported that Alesia had six out of eighteen tender points, and her fibromyalgia impact questionnaire indicated that the condition had a "mild to moderate" impact. Doc. 8-8 at 12-15.

In October 2006, Alesia began seeing Dr. John Hong for her fibromyalgia. Doc. 8-11 at 67. Dr. Hong treated Alesia with monthly trigger-point injections and advised her to begin physical therapy three times per week. *Ibid*. In December 2006, noting that Alesia had begun practicing yoga and seeing a chiropractor for spinal adjustments, Dr. Hong stated that her condition was "much improved." *Id*. at 63. In April 2007, Dr. Hong informed the Bureau of

Disability Determination Services of Alesia's history of fibromyalgia, explained her treatment, noted that medication temporarily relieved her symptoms, and cautioned that rigorous activity and heavy lifting exacerbated her condition. *Id*. at 59-60.

Alesia also suffered from depression. Dr. McNett treated Alesia for depression in July 2005, adjusted her medication, and recommended counseling. *Id*. at 33. Alesia saw Dr. Joseph Beck for depression and other conditions from September through December 2006. In April 2007, Dr. Beck told the Bureau of Disability Determination Services that he saw Alesia every two weeks and that she suffered from sysphoria, anhendonia, lethargy, and generalized fatigue; he diagnosed her with major depressive disorder and fibromyalgia, and explained that she required an "extremely variable workload" in her workplace. *Id*. at 72-75.

In a July 2007 report, Dr. Beck concluded that Alesia had major depressive order of moderate severity, suffering from the symptoms listed in the April 2007 report as well as hostility, difficulty concentrating, and persistent anxiety. *Id*. at 90-93. Dr. Beck gave Alesia had a Global Assessment of Functioning ("GAF") score of 60, and her highest GAF in the preceding year was 70. *Id*. at 90; *see* Global Assessment of Functioning, Wikipedia, en.wikipedia.org/wiki/Global_Assessment_of_Functioning ("The Global Assessment of Functioning (GAF) is a numeric scale (1 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living."). Dr. Beck reported that Alesia had moderate restrictions in activities of daily living, moderate difficulties maintaining social functioning, frequent difficulties maintaining concentration or persistence, and repeated episodes of decompensation. Doc. 8-11 at 93. Dr. Beck stated that Alesia's conditions would

prevent her from "[m]aintain[ing] regular attendance" and being "punctual within customary, usually strict, tolerances." *Id*. at 92.

Two physicians reviewed Alesia's medical records on behalf of the Social Security Administration. Dr. Tyrone Hollerauer examined Alesia's mental health records (with the exception of Dr. Beck's July 2007 report) and determined that her depression was non-severe. *Id*. at 76-88. Specifically, Dr. Hollerauer concluded that Alesia's depression caused only mild inference with her daily living, social functioning, ability to maintain concentration, persistence, and pace, and that it did not result in episodes of decompensation. *Id*. at 86. Dr. Young-Ja Kim concluded that Alesia could lift twenty pounds occasionally and ten pounds frequently; could stand, sit, or walk for up to six hours in an eight-hour work day; and occasionally could climb stairs, balance, stoop, kneel, crouch, and crawl. *Id*. at 97-104.

### B. The Administrative Hearing

On July 3, 2012, the ALJ held a hearing at which Alesia and George Paprocki, a vocational expert, testified. Alesia testified as follows. She quit her job as an internal auditor and certified fraud examiner at Blue Cross in October 2006 after exhausting her leave under the Family Medical Leave Act. Doc. 8-12 at 28-29, 50. Before quitting, Alesia struggled to complete her tasks, could not handle her workload, generated incorrect reports, and often forgot how to do her job, causing her performance reviews to suffer. *Id*. at 51-54. Alesia attributed these problems to her pain and medication. *Id*. at 52.

Alesia later began seeing a doctor, a friend of hers, free of charge. *Id*. at 33. The doctor prescribed medicine, but she stopped taking it because she could not afford it. *Ibid*. Alesia smoked about two packs of cigarettes per week and had not considered quitting to pay for the prescriptions she could not afford. *Id*. at 33-34.

4

After leaving Blue Cross, Alesia unsuccessfully tried to find work that she could do at home. *Id*. at 30. She has had no income since that time, and lives in a friend's trailer. *Id*. at 31, 38. Laying down and remaining sedentary is the only way she can feel comfortable. *Id*. at 56. Alesia cannot do her own laundry, prepare a full meal, or grocery shop. *Id*. at 38-40. She does not bend over to pick things up, and she loses focus and concentration. *Id*. at 57. Her health has remained the same since leaving her job; she has memory problems and cannot lift anything. *Id*. at 47-48. But Alesia and a friend took a trip to Louisiana in November 2010. *Id*. at 35-36.

Paprocki testified after Alesia. Vocational expert testimony helps to determine "whether [the claimant's] work skills can be used in other work and the specific occupations in which they can be used." 20 C.F.R. § 404.1566(e). A vocational expert may "respon[d] to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy." *Id*. § 404.1560(b)(2).

The ALJ asked Paprocki whether a hypothetical individual who "can perform sedentary exertional work," "stand and walk two hours in an eight hour work day and sit six hours," "frequently interact with crowds, the public, and … coworkers," "concentrate and persist for two hour segments," and who "must have the option to sit down or stand up at will" could perform Alesia's past work. Doc. 8-12 at 62. Paprocki answered yes, but added that if the same person had to miss three or more days of work per month, he did not "believe that any kind of competitive work would be feasible" because "the standard [number of days an employee can miss with an ailment] is [no] more [than] one day a per month, and even at that, you're putting

5

your job in some jeopardy." *Id*. at 63. On cross-examination, Paprocki testified that Alesia's past positions required a high degree of accuracy and concentration. *Id*. at 66-67.

C. **The Commissioner's Decision**

On August 10, 2012, the ALJ issued a decision finding that Alesia was not disabled and therefore was ineligible for DIB. Doc. 8-12 at 2-16. The ALJ followed the five-step sequential evaluation process for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v). The five steps are as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011) (internal quotation marks omitted); *see also Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). RFC "is defined as 'the most [the claimant] can still do despite [her] limitations.'" *Weatherbee*, 649 F.3d at 569 n.2 (first alteration in original) (quoting 20 C.F.R. §§ 404.1545(a),416.945(a)). "A finding of disability requires an affirmative answer at either step three or step five. The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). At the fifth step, the government "must present evidence establishing that the claimant possesses the [RFC] to

6

perform work that exists in a significant quantity in the national economy." *Weatherbee*, 649 F.3d at 569 (footnote omitted).

The ALJ determined that Alesia was not engaging in "substantial gainful activity" (step one); that Alesia's fibromyalgia, degenerative disc disease of the lumbar spine, and hypothydroidism were "severe impairments," but that her depression was non-severe (step two); and that these impairments were not listed or equal to a listing in 20 C.F.R. § 404, subpart P, app. 1 (step three). Doc. 8-12 at 8-10. At step four, the ALJ determined that Alesia had the RFC to perform sedentary work, as defined in 20 C.F.R. § 404.1567(a), "except she required an option to alternate between sitting and standing at will but would not be off task more than 10 percent of the work period; she could not crawl or climb ladders, ropes or scaffolds; she could occasionally stoop, crouch, kneel, balance, reach overhead, and climb ramps and stairs; she should have avoided concentrated exposure to unprotected heights; she could frequently have engaged in gross or fine manipulation of objects; she could have frequently interact with crows and the public; she could have constantly interacted with coworkers; and she could have concentrated and persiste[d] for 2-hour segments." *Id*. at 11. In making this finding, the ALJ concluded that Alesia's testimony about her inability to perform daily activities was not fully credible and was outweighed by medical and other evidence in any event. *Id*. at 14. Based on this RFC, the ALJ determined that Alesia was able to perform her past work as an insurance claims auditor. *Id*. at 15-16. The ALJ accordingly concluded that Alesia was not disabled and did not proceed to step five of the sequential evaluation process. *Id*. at 16; *see* 20 C.F.R. § 404.1520(f) ("If you can still do [past relevant] work, we will find that you are not disabled.").

**Discussion**

A claimant is disabled under the Social Security Act if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant has the burden of showing that her impairments prevent her from performing prior employment and any other job generally available in the national economy. *See* 42 U.S.C. § 423(d)(2)(A).

Section 405 of the Social Security Act authorizes judicial review of the Commissioner's final decision—which, as noted above, is the Commissioner's final decision. *See* 42 U.S.C. § 405(g). The court reviews the Commissioner's legal determinations *de novo* and her factual findings deferentially, affirming those findings so long as they are supported by substantial evidence. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"; it "must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (internal quotation marks omitted). If the reviewing court finds that the Commissioner's decision is not supported by substantial evidence, "a remand for further proceedings is [usually] the appropriate remedy." *Briscoe*, 425 F.3d at 355. Moreover, the court "cannot uphold an administrative decision that fails to mention highly pertinent evidence," *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), or that rests on errors of law, *see Collins v. Astrue*, 324 F. App'x 516, 519 (7th Cir. 2009).

In addition to satisfying these standards, the Commissioner's opinion must build an "accurate and logical bridge from the evidence to [the] conclusion so that [the] reviewing court[] may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (internal quotation marks omitted); *see also Briscoe*, 425 F.3d at 351 ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) (holding that the Commissioner must "articulate at some minimal level [her] analysis of the evidence to permit an informed review") (internal quotation marks omitted). To build a logical bridge, the Commissioner must "sufficiently articulate [her] assessment of the evidence to assure [the court] that [she] considered the important evidence and to enable [the court] to trace the path of [her] reasoning." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (internal quotation and alteration marks omitted). The court "cannot uphold a decision by an administrative agency … if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

Alesia challenges the Commissioner's decision on four principal grounds: (1) the ALJ at failed to properly consider her treating physicians' opinions; (2) the ALJ did not consider that she missed work before leaving her job; (3) the ALJ erred in partially discrediting her testimony; and (4) the ALJ did not properly consider her ability to return to her previous work as an insurance claims auditor.

A.  The Opinions of Alesia's Treating Physicians

1.  Dr. McNett

Alesia first argues the ALJ erred in not giving proper consideration to certain of Dr. McNett's opinions. In June 2005, Dr. McNett stated that Alesia was "[t]otally disabled from all job duties" and had a "[s]evere limitation of functional capacity," rendering her "incapable of minimum (sedentary) activity." Doc. 8-10 at 72. In July 2005, Dr. McNett reported that Alesia was limited to sitting and standing for less than 30 minutes each at a time, required frequent resting, and could not return to work for approximately two months and only then on a part-time basis. *Id*. at 77-79. And in March 2006, Dr. McNett reported that Alesia's "permanent" condition rendered her "unable to perform work of any kind." *Id*. at 82.

The Commissioner argues the ALJ properly considered Dr. McNett's opinions, noting that the ALJ's written decision "included Dr. McNett's treatment notes," "recount[ed] Alesia's treatment," and "relayed Dr. McNett's July 2006 [report that] indicat[ed] … Alesia had 6/18 positive tender points and reported symptoms and limitations of mild to moderate testimony." Doc. 21 at 8. However, merely *considering* Dr. McNett's opinions is not enough if the ALJ did not adequately explain, in a manner that permits the court "to trace the path of [her] reasoning," *Hickman*, 187 F.3d at 689, *why* she discounted Dr. McNett's reports. As shown below, the ALJ did not provide such an adequate explanation.

The Commissioner next cites *Sarchet v. Chater*, *supra*, which sets forth a "rule of thumb" that a fibromyalgia diagnosis requires at least eleven of eighteen tender points. 78 F.3d at 306. The Commissioner appears to suggest that the ALJ rejected Dr. McNett's conclusions on the ground that his July 2006 report stated that Alesia had only six tender points. Doc. 21 at 8. The trouble with this argument is that the ALJ never said that she was basing her decision on

*Sarchet*'s rule of thumb. Under the *Chenery* doctrine, the Commissioner cannot supplement the ALJ's reasoning or provide a post-hoc rationale for the ALJ's decision. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014); *Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013); *Martinez v. Astrue*, 630 F.3d 693, 694 (7th Cir. 2011); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (holding that "a persuasive brief [cannot] substitute for" the ALJ's deficient opinion); *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). In any event, as the Commissioner concedes, Doc. 21 at 8 n.2, as of July 2012 no particular number of tender points was required to establish fibromyalgia as a medically determinable impairment. *See* SSR 12-2p (a finding of fibromyalgia requires the claimant to satisfy *either* the 1990 American College of Rheumatology Criteria (which includes the 11/18 tender point requirement) *or* the 2010 American College of Rheumatology Preliminary Diagnostic Criteria (which does not)). The *Chenery* doctrine also defeats the Commissioner's submission that the ALJ did not need to consider Dr. McNett's March 2006 report because it was "conclusory," "sheds little light on the severity of Alesia's condition," and "conflicts with Dr. McNett's July assessment," Doc. 21 at 8, as the ALJ did not mention those rationales.

The Commissioner next contends the ALJ appropriately declined to give credence to Dr. McNett's two 2005 reports because they "were completed more than a year before Alesia's alleged [November 2006] onset date." *Id*. at 8. It is true that a report's pre-dating the onset period might provide a reason for discounting its importance. *See Eichstadt v. Astrue*, 534 F.3d 663, 667 (7th Cir. 2008). But discounting is not the same as ignoring. A medical report from before onset (or after the insured period) often can illuminate the claimant's condition during the insured period, and the ALJ must consider and provide reasons for rejecting such a report in denying a claim. *See Parker*, 597 F.3d at 924-25 (reversing the ALJ's decision for failure to

11

consider evidence of the claimant's medical conditions after her last insured date, reasoning that the evidence might show she was previously disabled and noting that the ALJ "must … consider *all* relevant evidence"); *Halvorsen v. Heckler*, 743 F.2d 1221, 1225-26 (7th Cir. 1984) ("There can be no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period."); *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("The ALJ did not acknowledge any of her medical evidence before 2001, the year she claimed her disability began. This is error because the regulations require the ALJ to 'consider all evidence in [the] case record when [he] makes a determination or decision whether [claimant is] disabled,' 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3), and this court requires the ALJ to discuss 'the significantly probative evidence he rejects[.]'") (some citations omitted) (all but the final alteration in the original); *Doherty v. Astrue*, 2012 WL 4470264, at *5 (S.D. Ind. Sept. 27, 2012) ("The Seventh Circuit and other circuits have ruled that an ALJ must consider 'all' evidence in the administrative record and, in fact, pre-onset evidence may be particularly relevant to assessing a claimant's degenerative condition post-onset."); *Beth v. Astrue*, 494 F. Supp. 2d 979, 1007 (E.D. Wis. 2007) ("ALJs should not ignore medical reports simply because they predate the alleged onset of disability."). The ALJ here did neither.

Finally, the Commissioner argues that the ALJ's failure to consider Dr. McNett's June 2005, July 2005, and March 2006 reports was harmless because they were superseded by his July 2006 report. Doc. 21 at 8. The *Chenery* doctrine defeats this argument, as the ALJ never rejected the earlier reports on that ground. Moreover, as the above-cited cases make clear, more recent medical evidence does not relieve ALJs from their obligation to consider all of the evidence, including evidence from pre-onset time periods.

12

Taken together, these errors in the consideration of Dr. McNett's opinions require remand. *See Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (reversing the denial of benefits because the ALJ "failed to properly consider the relevant evidence," and "without any discussion of these relevant factors, the ALJ failed to build a logical bridge between the evidence and her conclusion"); *Parker*, 597 F.3d at 921 ("we cannot uphold an administrative decision that fails to mention highly pertinent evidence or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome") (citation omitted); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) ("We have repeatedly stated that the ALJ's decision must be based upon consideration of all the relevant evidence …."). Although reversal is warranted on this ground alone, the court will consider Alesia's other arguments for the parties' benefit on remand.

### 2.    Dr. Beck

Alesia argues that the ALJ erred in giving "some weight" to Dr. Beck's April 2007 report and "no weight" to his July 2007 report. Doc. 12 at 9. This argument is foreclosed by the law of the case doctrine because the district court resolved this particular issue in the Commissioner's favor during the first round of judicial review. Under the law of the case doctrine, "once an appellate court either expressly or by necessary implication decides an issue, the decision will be binding upon all subsequent proceedings in the same case." *Zamora-Mallari v. Mukasey*, 514 F.3d 679, 695 (7th Cir. 2008) (internal quotation marks omitted).

The first ALJ evaluated Dr. Beck's opinions in virtually the same manner as the ALJ whose decision is now before the court. *Compare* Doc. 8-3 at 19 (first ALJ) ("The findings contained in Dr. Beck's first assessment are given some weight, as they are fairly consistent with the record as a whole."), *ibid.* (first ALJ) ("The undersigned does not give [the July 2007]

13

opinion any weight" because "Dr. Beck's findings on this evaluation are generally vague and imprecise, providing mere conclusions with little or no explanation for his opinions."), *with* Doc. 8-12 at 9 (our ALJ) ("I give some weight to the opinion contained in Dr. Beck's April 2007 assessment as it is fairly consistent with the record as a whole."); *id*. at 9-10 (our ALJ) (calling the July 2007 assessment a "check box form with no explanations for the conclusions expressed therein" and declining to give the assessment "any weight" because the "findings on this evaluation are generally vague and imprecise, providing mere conclusions with little or no explanation for his opinions."). During the first round of judicial review, Alesia challenged the first ALJ's assessment of Dr. Beck's reports using the same arguments she deploys here. The district court squarely rejected those challenges. 789 F. Supp. 2d at 931-32 (rejecting "Claimant['s] conten[tion] that the ALJ erred by giving only 'some weight' to Dr. Beck's April 2007 evaluation," and stating, "[a]s for Dr. Beck's July 2007 report, the ALJ provided ample reasons for disregarding it"). Reaching a contrary conclusion here would contravene the law of the case doctrine. *See Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998) ("The law of the case doctrine … is applicable to judicial review of administrative decisions."); *Magee v. Astrue*, 2008 WL 1836687, at *3 (S.D. Ind. Apr. 23, 2008) (Hamilton, J.).

Alesia argues that the law of the case doctrine does not apply because on remand a new ALJ decided the case with a new rationale. Doc. 25 at 1-2. This argument fails to persuade. First, the doctrine turns on which *court* previously decided an issue, not on which the *judge* handled the matter on remand. Indeed, Alesia herself invoked the law of the case doctrine on a different issue in this appeal. Doc. 12 at 15 (citing *Wilder*, 153 F.3d at 803). Second, as described above, our ALJ did not provide a different rationale for rejecting Dr. Beck's July 2007 opinion; rather, our ALJ's rationale was materially identical to the first ALJ's rationale, which

14

was the very rationale approved during the first round of judicial review. Alesia is right that she presented some new evidence during the hearing before our ALJ, which in some circumstances could provide a reason for not applying the doctrine. *See Wilder*, 153 F.3d at 803 ("New evidence can furnish compelling grounds for departure from a previous ruling."). But Alesia does not explain *how* the new evidence provides a compelling reason to depart from the district court's prior determination that substantial evidence supported the first ALJ's evaluation of Dr. Beck's reports.

Alesia's next argument, which was not addressed in the prior round of judicial review, is that the ALJ failed to "explain how the residual functional capacity assessment was consistent with Dr. Beck's [April 2007] opinion" regarding her depression and other ailments. Doc. 12 at 9 ("The residual functional capacity assessment does not include anything related to the need for a variable workload, and the ALJ did not explain how she interpreted this opinion.") (citation omitted). At step two, the ALJ acknowledged that Dr. Beck said that Alesia required a "variable workload." Doc. 8-12 at 9. But in constructing the RFC during step four, the ALJ stated that Alesia's "nonsevere depression is accommodated by limiting her to frequent interaction with crowds and the public and constantly [sic] interaction with coworkers and by limiting her concentration and persistence to 2-hour segments," adding that "[t]he evidence does not support any further limitations to the claimant's work-related activities due to the claimant's nonsevere impairment." *Id*. at 13.

This analysis falls short. "When determining a claimant's RFC, the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment." *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010) (citing 20 C.F.R. § 404.1523); *see also Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009);

15

*Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). Accordingly, the non-severity of Alesia's depression cannot, on its own, supply the premise for the ALJ's conclusion that the "evidence does not support any further limitations to the claimant's work-related activities." Doc. 8-12 at 13. And no logical bridge in the ALJ's opinion connects her determination that limiting Alesia's interactions with crowds and the public and her concentration to two-hour segments is consistent with Dr. Beck's opinion that Alesia's depression required an "extremely variable workload."

### B. Evidence That Alesia Missed Work

Alesia's next argues the ALJ failed to consider that her fibromyalgia forced her to miss numerous days of work until she exhausted her leave and left her position at Blue Cross. Doc. 12 at 10-11. The Commissioner responds that the ALJ, having emphasized the significant improvement that Alesia experienced from the trigger point injections and the evidence that Alesia's condition did not worsen over time, "implicitly rejected her contention that she would miss days of work." Doc. 21 at 10. On remand, the ALJ should *explicitly* consider whether Alesia's ailments caused her to miss work and, if so, how that finding affects her RFC. *See Buckhanon v. Astrue*, 368 F. App'x 674, 678 (7th Cir. 2010) ("Although ALJs need not address every piece of evidence in detail, they must address significant evidence and explain why strong evidence favorable to the claimant is overcome by other evidence.").

### C. Credibility Determination

Alesia argues that the ALJ erred in discrediting parts of her testimony. Specifically, Alesia submits that the ALJ's reliance on boilerplate language disapproved by the Seventh Circuit shows that the ALJ assessed her ability to work without considering her testimony, and that the ALJ used that determination to find her not credible to the extent her testimony was inconsistent therewith. Doc. 12 at 14-16.

It is true that ALJs must evaluate the claimant's credibility in determining her ability to work and not use the ability-to-work determination to assess the claimant's credibility. *See Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012) ("[T]he assessment of a claimant's ability to work will often … depend heavily on the credibility of her statements concerning the 'intensity, persistence and limiting effects' of her symptoms, but the [ALJ's boilerplate] implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards. The administrative law judge based his conclusion that Bjornson can do sedentary work on his determination that she was exaggerating the severity of her headaches. Doubts about credibility were thus critical to his assessment of ability to work, yet the boilerplate implies that the determination of credibility is deferred until ability to work is assessed without regard to credibility, even though it often can't be."); *see also Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); *Spiva*, 628 F.3d at 348. However, although the ALJ at one point used language similar to that criticized in *Bjornson*, Doc. 8-12 at 12 ("the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the overall evidence which forms the basis for the above [RFC]"), the ALJ elsewhere clearly explained why she discredited Alesia's testimony. *Ibid.* (documenting Alesia's treatment history and explaining that "the medical records demonstrate routine and conservative treatment," that "treatment has been relatively beneficial and does not demonstrate that the claimant's treating physicians have recommended any more drastic form of treatment," and that the "treatment records also do not demonstrate worsening of the claimant's impairment over time"); *id.* at 14 (observing that Alesia's testimony was inconsistent with statements in her medical records). Thus, the ALJ "point[ed] to information" that "justifie[d] h[er] credibility determination" even though she used "boilerplate" that, without

17

further support, would have warranted reversal. *Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013); *see also Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012) (criticizing the ALJ's boilerplate for "put[ting] the cart before the horse, in the sense that the determination of capacity must be based on the evidence," but refusing to reverse because "the ALJ did offer reasons grounded in the evidence, and so [the court could] proceed to examine them").

Although Alesia does challenge some of the ALJ's substantive reasoning, substantial evidence supports the ALJ's determination regarding Alesia's credibility. Alesia testified that she had not prepared a full meal in "[f]our to five years," that "it's been years" since she shopped for groceries, and that she "ha[sn't] done [her] own laundry in years[] because [she] can't carry anything and walk at the same time." Doc. 8-12 at 38-40. She reported similar limitations in an April 2007 Social Security questionnaire. Doc. 8-7 at 27 ("[m]ostly my husband cooks"); *id.* at 28 ("Most of the time I can't" carry bags, groceries, a basket of laundry, or trash.); *id.* at 31 ("I cannot do the shopping, my husband does this"); *id.* at 32 ("I cannot carry the laundry … and bending over to change loads sets my back to throbbing and my legs start to ache …. I have not made a bed in so long …. I cannot vacuum or wash the floors without having to take muscle relaxers and painkillers afterwards."). But in a July 2006 questionnaire, Alesia said she could do "some" shopping, laundry, meal preparation, dishwashing, vacuuming, bed making, walking several blocks, and yard work. Doc. 8-10 at 4. The inconsistency between Alesia's July 2006 2006 questionnaire and her testimony supports the ALJ's modest conclusion that "at least at times, the claimant's activities were greater than alleged." Doc. 8-12 at 14.

Moreover, the ALJ observed in her credibility determination that Alesia had done yoga and taken a trip to Louisiana. Alesia argues "the ALJ does not explain how Ms. Alesia's limited daily activities … supported a finding that she was capable of sustaining full-time work" because

the "critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons … and is not held to a minimum standard of performance, as she would be by an employer." Doc. 12 at 15 (citing *Bjornson*, 671 F.3d at 647). But the ALJ did not use Alesia's yoga and Louisiana trip to suggest that she could hold a job; rather, the ALJ used it to undermine her testimony that she could not complete household chores like bathing. Doc. 8-12 at 14. An inability to do *any* chores or to bend over is inconsistent with practicing yoga, even if under *Bjornson* it might be consistent with the inability to keep a job.

The ALJ did not give proper consideration to Alesia's work history in determining her credibility. Social Security Ruling 96-7p requires an ALJ to consider the claimant's "prior work record and efforts to work" in determining her credibility. This factor favored Alesia, as her lengthy career could be said to suggest that her medical conditions, not some other motive, led her to quit working. Indeed, in remanding this case after the first round of judicial review, the court suggested Alesia had good reason not to leave her job—she had testified she stopped receiving treatment because she lost her employer-provided health insurance after she left. 789 F. Supp. 2d at 934-35. On remand, the ALJ should consider how Alesia's work history bears on her credibility.

### D. Alesia's Ability to Return to Work

Alesia testified that she could "no longer perform her work because she missed too many days and needed more flexibility in her schedule, towards the end of her employment she was making errors in her reports, and … sitting … was uncomfortable." Doc. 8-12 at 51-53. Citing cases like *Nolen v. Sullivan*, 939 F.2d 516, 519 (7th Cir. 1991), and *Prince v. Sullivan*, 933 F.2d 598 (7th Cir. 1991), Alesia argues the ALJ erred by failing to properly consider this testimony in

19

concluding that she could return to past work. Doc. 12 at 12. However, all *Prince* and *Sullivan* hold is that the ALJ at step four must make specific findings of fact about the claimant's RFC, the demands of the claimant's past relevant work, and whether the claimant's RFC would permit a return to that work. *See Prince*, 933 F.2d at 602-03; *Sullivan*, 939 F.2d at 519; *see also* SSR 82-62 (setting forth these requirements). The ALJ made all three findings here. Doc. 8-12 at 11-15 (making the RFC determination, discussing the skill and exertion level of Alesia's past work, and finding that Alesia's RFC meant she "was able to perform work as an insurance claims auditor as actually and generally performed"). On remand, the ALJ's assessment of Alesia's RFC might change based on a complete analysis of Dr. McNett's opinions or reconsideration of Alesia's credibility, and this in turn might change the ALJ's assessment of her ability to perform past relevant work. But aside from the errors in determining Alesia's RFC, there was no independent error in applying step four.

## Conclusion

For the foregoing reasons, the court grants Alesia's summary judgment motion, denies the Commissioner's summary judgment motion, and remands the case to the Commissioner for further proceedings consistent with this opinion.

August 26, 2015

United States District Judge